NUMBER 13-03-234-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG

 

SCOTT MICHAEL POJAR,                                                              Appellant,

 

                                                             v.                                

 

WENDELL AND NEIDA CIFRE, AS

NEXT FRIENDS OF BEATRICE CIFRE,   

FORMERLY A MINOR CHILD,                                                        Appellees.

 

    On
appeal from the 56th District Court of Galveston County, Texas.

 

 

                                          O
P I N I O N

 

                         Before
Justices Hinojosa, Yañez, and Garza 

                                         Opinion
by Justice Garza

 








In this personal-injury case arising from a
two-vehicle collision, the Court addresses five main issues:  (1) Did the trial court abuse its discretion
by giving six peremptory challenges to the plaintiff and only three to each of
two antagonistic co-defendants?  (2) Is
any issue regarding the admission of evidence of marijuana use properly before
this Court?  (3) Does sufficient evidence
support an award for loss of past services if there is no evidence of lost
services?  (4) Must a trial court
disregard a jury=s finding of malice as immaterial if the jury does
not award exemplary damages?  (5) Is
evidence that a person used marijuana prior to operating a motor vehicle on a
public road and entering an intersection despite a red light, thereby causing a
collision with another vehicle, legally or factually insufficient to prove
malice if the same person admits that driving under the influence of marijuana
is wrong because it is dangerous?

We answer all these questions in the negative.  Accordingly, the judgment of the trial court
is reversed and rendered in part and affirmed in part.  See Tex.
R. App. P. 43.2(a), (c). 
Specifically, the portion of the judgment awarding $200,000 for loss of
past services is reversed and a judgment is rendered awarding zero damages for
loss of past services.  The judgment is
otherwise affirmed. 

I.  Background

The following facts are undisputed.  This case arises from a two-car collision
that occurred at the intersection of two farm-to-market roads in Galveston
County.  The accident occurred just
before 2:00 a.m. on the morning of Sunday, December 12, 1999.  The occupants of the vehicles were all
teenagers. 

Scott Michael Pojar was driving one of the cars,
which had a total of four occupants.  Two
of the occupants, Amanda Schaub and Jamie McCaughey, were relatively unharmed
by the accident.  The other two occupants
were seriously hurt.  








Scott Pojar was trapped in his vehicle and had to be
rescued by the AJaws of Life.@  He suffered
a lacerated liver and a broken jaw and shoulder.  He was taken to the hospital via ALife Flight@ helicopter. 
The damage to Scott Pojar=s jaw changed his appearance and prevents him from
opening his mouth widely, but he has otherwise recovered.  

Beatrice Cifre, the fourth occupant of Scott Pojar=s vehicle, was instantly paralyzed during the
collision.  She was also taken to the
hospital via Life Flight helicopter.  At
trial, there was extensive, undisputed evidence of the serious physical,
emotional, and financial difficulties that now face Beatrice Cifre and her
family.  She is permanently paralyzed
from the waist down and requires a great deal of care. 

Laura Kathleen McCormick was the driver of the
second car.  She had no passengers in her
vehicle, and she escaped the collision with only minor injuries.  

Other than the teenagers involved in the accident,
the only eyewitness was Charles McCullough. 
He was traveling in the same direction on the same road as
McCormick.  McCullough testified that
McCormick passed his vehicle and subsequently collided with the vehicle driven
by Scott Pojar.








As next friend of Beatrice Cifre, a minor, Wendell
Cifre and Neida Cifre sued Scott Pojar, Brenda Pojar (Scott=s mother), and Laura McCormick for damages sustained
as a result of the accident.  The
defendants filed cross-claims against each other, alleging that the other
driver was the sole cause of the accident. 
The case was tried to a jury, and the parties presented conflicting
evidence about who had the green light at the intersection.  Each driver claimed that the other had caused
the accident by running a red light.  The
jury also heard testimony that Scott Pojar and several of his friends had been
smoking marijuana before the accident.  There
was evidence that some of the teenagers, though not Scott Pojar, had also been
drinking alcohol.  On direct examination
by her attorney, Brenda Pojar admitted that she knew Scott Pojar had used
marijuana in the past and had broken his promise to stop using it.  For his part, Scott Pojar testified that he
did not use any marijuana on the night of the accident, though he admitted
using marijuana in the past, admitted that he had driven his car after using
marijuana in the past, and also admitted that he had a marijuana-related
sticker on his car.  Testimony from other
witnesses was also presented to corroborate Scott Pojar=s version of events.

An instructed verdict was granted in favor of Brenda
Pojar on the sole claim against her, which was for negligent entrustment.  The jury found that Scott Pojar=s negligence caused the accident and awarded
compensatory damages to Wendell and Neida Cifre and separate compensatory
damages to Beatrice Cifre.  The jury
further found that the harm to Beatrice Cifre resulted from malice, but it did
not assess any exemplary damages against Scott Pojar.  The trial court entered a judgment on the
verdict, and this appeal by Scott Pojar ensued. 


II. 
Allocation of Peremptory Challenges

Scott Pojar=s first issue challenges the trial court=s allocation of peremptory challenges:  six were given to Wendell, Neida, and
Beatrice Cifre; three were given to Scott and Brenda Pojar; and three were
given to Laura McCormick.  The trial
court instructed the parties that only counsel for the defendants could work
together in exercising the challenges. 
On appeal, no suggestion has been made that this instruction was
violated.  As discussed below, we find no
abuse of discretion in the trial court=s allocation of challenges.  








We believe it is important, at the outset, to
acknowledge the serious consequences of error related to the allocation of
peremptory challenges.  Under current
case law, such error will usually lead to reversal of the judgment and remand
for new trial.  See, e.g., Garcia
v. Cent. Power & Light Co., 704 S.W.2d 734, 737 (Tex. 1986) (AWhen the trial is hotly contested and the evidence
sharply conflicting, the error results in a materially unfair trial without
showing more.@).  But this
was not always so.  At one point in time,
such errors were very rarely grounds for reversal.  See Tamburello v. Welch, 392 S.W.2d
114, 116 (Tex. 1965) (AEven before the adoption of the Rules of Civil
Procedure, a refusal to allow the proper number of peremptory challenges was
[often] regarded as immaterial . . . .@).  Later,
errors in the allocation of peremptory challenges became more common, though
still somewhat difficult, bases for new trial. 
See Patterson Dental Co. v. Dunn, 592 S.W.2d 914, 920B21 (Tex. 1979) (noting that the traditional
harmless-error rule had been relaxed as to error regarding peremptory
challenges).  Presently, a finding of
such error spells certain doom for the judgment on appeal.[1]
    








Although the law thus appears to have changed over
the years, at least one thing has remained constant:  the elimination of any unfair advantage is
one of the most fundamental tenets guiding the trial courts in allocating
peremptory challenges.  See Tex. R. Civ. P. 233.  What has changed, and what we must
continually grapple with as an appellate court, is what actually amounts to an
unfair advantage in the allocation of peremptory challenges and what degree of
harm must be shown to justify a new trial. 
See id.; Tex. R.
App. P. 44.1(a).  In explaining
today=s decision, we emphasize that, regardless of what
degree of harm must be shown to justify a new trial, the complaining party must
always bear the initial burden of showing actual error.  Considerations of fairness remain an integral
part of today=s jurisprudence, and we decide today=s case by considering whether the trial court=s allocation of peremptory challenges produced an
unfair advantage, an approach which is consistent with supreme court
precedent.  Because we find no abuse of
discretion, we do not reach any issues of harm. 


A. 
Controlling Authority          

We begin with an overview of controlling
authority.  The starting point of our
analysis is rule 233:  AEach party to a civil action is entitled to six
peremptory challenges in a civil case tried in district court . . . .@  Tex. R. Civ. P. 233.  The number of challenges may be different if
a lawsuit involves multiple litigants on the same side of the docket.  Garcia, 704 S.W.2d at 736.  In such cases, the trial court must determine
whether any of the litigants on the same side of the docket are antagonistic
with respect to an issue of fact that the jury will decide.  Tex.
R. Civ. P. 233; Garcia, 704 S.W.2d at 736.  If no antagonism exists, each side must
receive the same number of challenges.  Garcia,
704 S.W.2d at 736.  This means, for
instance, that if the total number of challenges were 12, six would go to the
plaintiffs= side and six would go to the defendants= side.  See
id.  In contrast, if the trial court
determines that antagonism exists, it has discretion, Aupon motion of any litigant made prior to the
exercise of peremptory challenges,@ to Aequalize@ the number challenges Aso that no litigant or side is given an unfair
advantage as a result of the alignment of the litigants and the award of
peremptory challenges to each litigant or side.@  Tex.
R. Civ. P. 233.      








On appeal, the reviewing court must first conduct a
de novo review to determine whether any antagonism existed between any
litigants on the same side of the docket on an issue to be decided by the
jury.  See Dunn, 592 S.W.2d at
919.  If so, the reviewing court
considers whether the trial court=s allocation of peremptory challenges created an
unfair advantage that amounted to an abuse of discretion.  Id. at 919B20.  Finally,
if and only if there was antagonism between litigants on the same side of the
docket and an unfair advantage created by the allocation of peremptory
challenges, the reviewing court must decide whether the trial was materially
unfair by determining whether the case was hotly contested and the evidence
sharply conflicting.  See id. at
921. 

B.  Antagonism


Rule 233 burdens the trial court with the duty to
decide whether any of the litigants aligned on the same side of the docket are
antagonistic with respect to any issue to be submitted to the jury.  Tex.
R. Civ. P. 233.  In this case,
there were three plaintiffs:  Wendell,
Neida, and Beatrice Cifre.  The suit was
originally filed by Wendell and Neida Cifre as next friends of Beatrice Cifre,
who was then a minor.  By the time of
trial, Beatrice Cifre was no longer a minor and she became a plaintiff in her
own capacity.  Her parents remained
plaintiffs in the suit, seeking to recover damages that they sustained as a
result of the accident.

There were also three defendants in the case:  Laura McCormick and Scott and Brenda
Pojar.  As noted above, the claim against
Brenda Pojar was ultimately dismissed by way of instructed verdict.  This left the jury to determine the liability
of Laura McCormick and Scott Pojar.








At trial and on appeal, the parties have argued the
peremptory challenge issue as though there were only three litigants in this
case:  Beatrice Cifre, as sole plaintiff,
and Laura McCormick and Scott Pojar, as co-defendants.  To be consistent with the parties= treatment of the case, we will decide Pojar=s issue as he has presented it:  Beatrice Cifre and her parents (collectively ACifre@) will be treated as one plaintiff, Scott Pojar and
Brenda Pojar (collectively APojar@) will be treated as one defendant, and Laura
McCormick will be treated as Pojar=s co-defendant.[2]            

Because there were multiple litigants on the same
side of the docket, the trial court had the duty to decide whether any
antagonism existed between them.  See
id.  Before trial, counsel for Pojar
pointed out that Cifre was much more hostile toward Pojar than McCormick.  Pojar=s attorney asked that Cifre and McCormick be treated
as the same side for the purposes of picking a jury.  The trial court denied this request, but it
took notice on the record that the attorneys for Cifre and McCormick were Aacting chummy.@  Inherent in
this statement is an acknowledgment that Pojar and McCormick were, to some
degree, antagonistic toward one another. 

Notably, antagonism is the central issue discussed
in the dissenting opinion.  We have no
quarrel with the dissent=s conclusion that antagonism existed between Pojar
and McCormick, nor is there any reason to bicker over the extent to which this
antagonism manifested itself prior to the exercise of peremptory
challenges.   Our concern is with how the
trial court is expected to remedy such antagonism and, more particularly, with
whether the trial court got it wrong in this case. 

C.  Issue
Preservation








Pojar did not request equalization of peremptory
challenges at trial, though his attorney did file a AMotion for Equalization of Peremptory Strikes.@  In Texas,
motions are judged by their substance rather than their titles.  City of McAllen v. Ramirez, 875 S.W.2d
702, 705 (Tex. App.CCorpus Christi 1994, orig. proceeding).  In substance, Pojar=s motion asked that Cifre and McCormick be
considered as the same side for the purpose of picking a jury.  Pojar wanted either six or eight peremptory
challenges for himself and an equal number to be split between Cifre and
McCormick.  

The substance of Pojar=s
request is clear from counsel=s arguments to the trial court:

The Court:                            Okay.  But what I am asking you is [whether] there
[is] a case that ever put the defendants with the plaintiffs where there wasn=t some kind of written agreement?

 

Counsel for Pojar:             Yes,
Your Honor.  D.B. Counsel versus
Banger Life Insurance [sic]; Diamond Shamrock versus Went [sic]; Williams
versus Texas City Refinery.

 

*   *   *

 

The Court:                            I will take judicial
notice that they [referring to counsel for Cifre and counsel for McCormick] are
acting chummy, but I don=t think that gets us there.  I don=t think that=s the law. 

 

Counsel for Pojar: 
           I think the most apropos case is the Diamond Shamrock case.

 

The Court:                            They gave the
plaintiff 12, chummy defendant six, said they were aligning them on the same
side and gave the defendant out there by himself six.

 

Counsel for Cifre: I haven=t seen the case, Judge.

 

The Court:                            I will let you have
it.  I love these cases that don=t tell you what you should do. 

 

*   *    *

 

The Court:                            So, what is it that
you all are asking for here?

 








Counsel for Pojar:             Just
the same amount of strikes they get.  If
we get six strikes, they get four and two, five and one, three and three.  Or eight each side, four, four, and eight.  Just some kind of equalization so we have a
fair right to form the jury, the same right you have.

 

The Court:                            I will deny your
request and give the plaintiff six, you three apiece, and if you want to work
together that=s fine.  But .
. . [counsel for McCormick is] not to work with [counsel for] the plaintiffs on
the strikes. 

From the foregoing exchange, it is clear that,
although counsel used the term Aequalization,@ what he actually sought from the trial court was Athe same amount of strikes they get,@ meaning the combined number given to Cifre and
McCormick.  The substance of this request
is also apparent from Pojar=s motion for equalization, which sought Athe same amount of strikes they get.@  

Although counsel used the word Aequalization@ in making his request, he sought relief other than
equalization.  The supreme court has
explained that equalization may be accomplished by increasing the number of
challenges allotted a sole litigant on one side, by decreasing the number
allotted the multiple litigants on the other side, or by both.  See Dunn, 592 S.W.2d at 920.  Pojar did not ask for such relief.  He asked the court to change the alignment of
sides.  Pojar wanted Cifre and McCormick,
a plaintiff and a defendant, to be treated as the same side, leaving Pojar as
the sole litigant on the other side.








Our Court has recognized this type of relief as Arealignment of sides@ and
has discussed it as relief that is separate and distinct from equalization of
challenges.  See Diamond Shamrock
Corp. v. Wendt, 718 S.W.2d 766, 769 (Tex. App.CCorpus Christi 1986, writ ref=d n.r.e.) (AThe number of peremptory challenges allotted to each
litigant presents a different problem.@).[3]   We have also recognized that any error in
the trial court=s allocation of peremptory challenges must be
preserved by a timely, specific objection. 
Tex. Commerce Bank Reagan v. Lebco Constructors, 865 S.W.2d 68,
78 (Tex. App.CCorpus Christi 1993, writ denied).

Pojar raises a different issue on appeal than what
was argued at trial.  Pojar contends that
the trial court erred in denying his motion Ato
alter the usual allocation of peremptory strikes,@ but
Pojar actually requested that the trial court change the alignment of sides
rather than equalize the challenges.  The
trial court recognized this distinction and asked counsel for Pojar to produce
appellate authority allowing it Ato put [one of] the defendants with the plaintiffs
where there wasn=t some kind of written agreement.@  Rather than
clarifying any misunderstanding by specifying that what he actually wanted was
equalization rather than realignment, counsel immediately responded with case
law to support his request to align Cifre and McCormick as a single side,
citing, among other things, this Court=s opinion in Wendt.  See Wendt, 718 S.W.2d at
769.  The trial court was unconvinced
that realignment was appropriate and overruled Pojar=s request.  

Pojar now complains that the trial court erred by failing
to equalize the challenges, even though a different request was made at
trial.  The discrepancy between Pojar=s request at trial and Pojar=s complaint on appeal prompts this Court to evaluate
whether Pojar=s first issue was preserved for appellate
review.  








In general, as a prerequisite to presenting a
complaint for appellate review, the record must show that the trial court ruled
or refused to rule on a timely request, objection, or motion that stated the
grounds for the ruling that the complaining party sought from the trial court
with sufficient specificity to make the trial court aware of the complaint,
unless the specific grounds were apparent from the context.   See Tex.
R. App. P. 33.1(a).  This rule has
been generally understood to mean that, in most instances, an appellate
complaint cannot be reviewed unless the same, specific complaint was first made
to the trial court.  See San Antonio
v. Schautteet, 706 S.W.2d 103, 104 (Tex. 1979); McCain v. NME Hosps.,
Inc., 856 S.W.2d 751, 755 (Tex. App.CDallas 1993, no writ).  This rule applies to errors related to the
allocation of peremptory challenges.   In
the Interest of M.N.G., 147 S.W.3d 521, 532 (Tex. App.CFort Worth 2004, pet. denied) (A[A]ny error in the trial court=s allocation of jury strikes among the parties must
be preserved by a timely objection.@).








Even if there were merit to Pojar=s first issue, it would be improper to reverse the
judgment of the trial court on the basis of equalization, given that Pojar
asked the court to realign the sides rather than to equalize the
challenges.  Nor would it be fair to
conclude that a request for equalization was inherent in Pojar=s request for realignment.  Pojar requested that Cifre and McCormick be
treated as a single side; he never asked the trial court to simply increase his
number of peremptory challenges, which would have been a proper request for
equalization.  See Dunn, 592
S.W.2d at 920.  The trial court should
not be faulted for Pojar=s failure to clearly articulate the relief he
sought.  We have long required parties to
raise requests Awith sufficient specificity to make the trial court
aware of the complaint [or relief sought].@  Tex. R. App. P. 33.1(a).  The circumstances of this case present no
occasion for departing from this basic procedural expectation, much less an
occasion for finding an abuse of discretion in the trial court=s ruling on the request actually made.                    

It should also not be forgotten that important
prudential considerations underscore our rules on issue preservation.  In the Interest of B.L.D., 113 S.W.3d
340, 350 (Tex. 2003).  Requiring parties
to raise complaints at trial conserves judicial resources by giving trial
courts an opportunity to correct an error before an appeal proceeds.  Id.; In re C.O.S., 988 S.W.2d
760, 765 (Tex. 1999).  In addition, our
preservation rules promote fairness among litigants.  B.L.D., 113 S.W.3d at 350.  A party should not be permitted to waive,
consent to, or neglect to complain about an error at trial and then surprise
his opponent on appeal by stating his complaint for the first time.  Id.; Pirtle v. Gregory, 629
S.W.2d 919, 920 (Tex. 1982) (per curiam). 
Each of these prudential considerations is present in this case, and
they collectively militate against Pojar=s position.  

D. 
Realignment of Sides








To the extent Pojar=s
first issue challenges the trial court=s failure to realign sides, we hold that no error
has been shown.  This Court addressed
realignment of sides in Wendt, a case which also involved a single
plaintiff on one side facing two defendants on the other.  Wendt, 718 S.W.2d at 769.  In Wendt, we noted that, although
there had been no settlement between any of the parties, the degree of the
plaintiff=s antagonism toward one of the defendants was not
the same as toward the other defendant.  Id. 
Nevertheless, because the plaintiff was actively seeking recovery
against both defendants, we held that the trial court did not err in failing to
realign the plaintiff with the co-defendant facing the least antagonism from
the plaintiff.  Id.   

The excerpt from the reporter=s record included in the text above indicates that
counsel for Pojar directed the trial court to Wendt and that our
precedent was given due consideration. 
The record also reflects the trial court=s
conclusion that, in the absence of evidence that the litigants had ceased to be
adversaries, such as a settlement agreement or the like, realignment of sides
would be improper.  This is an accurate
application of the Wendt opinion, in which this Court specifically noted
the absence of a settlement agreement and held that realignment would have
therefore been improper, even though Athe two defendants were obviously antagonistic to
each other@ and the interests of one of the defendants were Aclosely identified@ with
those of the plaintiff.  Id. at
770.  

The trial court=s ruling in this case is also consistent with the
other two opinions relied upon by Pojar in making his request for realignment.  See Williams v. Tex. City Refining, Inc.,
617 S.W.2d 823, 826B27 (Tex. App.CHouston [14th Dist.] 1981, writ ref=d n.r.e.); Council v. Bankers Commercial Life
Ins. Co., 558 S.W.2d 487, 489 (Tex. App.CBeaumont
1977, writ ref=d n.r.e.).  








In Williams, the trial court allotted seven
peremptory challenges to the defendant, six to the plaintiff, and one to a
third-party defendant, with whom the plaintiff had apparently reached a
settlement agreement prior to trial.  Williams,
617 S.W.2d at 826.  On appeal, the
plaintiff complained that the trial court erred in allocating peremptory
challenges.  Id.  Overruling this issue, the appellate
court concluded that, given the agreement between the plaintiff and the
third-party defendant that was announced to the court prior to the voir dire
examination and in view of the antagonism existing between the defendant and
the third-party defendant, there was no abuse of discretion in the allocation
of the challenges.  Id. at 826B27.    

This case stands in contrast with Williams in
that there was no similar agreement between Cifre and McCormick.  This distinction was noted by the trial
court, which correctly declined to realign the sides in the absence of such an
agreement. 

This case is also different than Bankers
Commercial, a case in which the appellate court found reversible error
because the plaintiff and one of the defendants had a Acozy relationship@ that
allowed the plaintiff to achieve an Aunfair advantage@ over
the other defendants.  Bankers
Commercial, 558 S.W.2d at 489.  In Bankers
Commercial, the plaintiff brought an action for tortious interference with
contractual relationships against three defendants, one of who, an individual
named Scott, began collaborating with the plaintiff before trial.  Id. at 487B88.  Scott
confessed that he had embezzled in excess of $450,000 from the plaintiff and
agreed to make restitution insofar as he was capable of doing so.  See id. at 488.  Scott also agreed to cooperate with the
plaintiff in the prosecution of its claims against the other defendants.  See id.  Scott further agreed to assert claims against
his two co-defendants and to give any proceeds from the claims to the
plaintiff.  See id.  Under these circumstances, the appellate court
found reversible error in the trial court=s award of six peremptory challenges apiece to Scott
and the plaintiff.  See id. at 488B89.  Such
extreme circumstances were not present in the instant case.

There was therefore no error in the trial court=s refusal to realign sides.

E. 
Equalization of Peremptory Challenges








In the interest of providing the parties with a full
disposition of all issues raised on appeal, we find it appropriate to note
that, even if any issue regarding equalization of peremptory challenges were
preserved, Pojar would still not prevail on his first issue.  See Tex.
R. App. P. 33.1(a), 47.1.  That
is, even if the issue of equalization were properly before this Court, as the
dissent concludes, we would hold that no abuse of discretion has been
shown.  

Although the existence of antagonism has long been
recognized as an issue of law subject to de novo review, a trial court=s allocation of peremptory challenges in the face of
antagonism, the so-called Aequalization@ of strikes, is to be accomplished in the exercise
of the trial court=s sound discretion.[4]  In other words, the nature and degree of the
antagonism and its effect on the number of peremptory challenges allocated to
each litigant or side are matters left to the discretion of the trial court.  E.V.R. II Assoc., Ltd. v. Brundige,
813 S.W.2d 552, 556 (Tex. App.CDallas 1991, no writ); Webster v. Lipsey, 787
S.W.2d 631, 638 (Tex. App.CHouston [14th Dist.] 1980, writ denied).  Thus, assuming the issue of equalization were
properly before this Court, we would decide whether the trial court=s allocation of peremptory challenges amounted to an
abuse of discretion.  See Am. Cyanamid
Co. v. Frankson, 732 S.W.2d 648, 661 (Tex. App.CCorpus Christi 1987, writ ref=d n.r.e.) (A[I]f the trial court=s
decision is based upon a reasonable assessment of the situation before it at
the time the challenges are made, the decision should remain intact.@). 








Pojar argues, and the dissent would apparently find,
that the trial court abused its discretion. 
Each relies on the supreme court=s opinion in Dunn for the proposition that it
is reversible error to require two antagonistic defendants to share six strikes
against a plaintiff=s six strikes. 
See Dunn, 592 S.W.2d at 918. 
We believe this is a misreading of Dunn.       

Dunn clarified
that antagonism between co-defendants does not require exact numerical equality
of peremptory challenges.  Id. at
920.  That is, two co-defendants are not
each entitled to six peremptory challenges simply because they are
antagonistic.  See id.   In fact, Dunn recognized the trial
court=s discretion to create disparity in the number of
challenges to promote the ends of justice and to eliminate any unequal
advantage.  Id. at 919B20.  In
reaching its holding, the supreme court noted that a disparity of two-to-one
would generally be acceptable, whereas a disparity of four-to-one would be an
abuse of discretion.  Id. at
920.  

We believe that the disparity ratio in this case was
between two-to-one and three-to-one. 
Given that the trial court did not allow counsel for Cifre and McCormick
to work together in exercising their challenges and given that there was
antagonism between not only McCormick and Pojar but also between Cifre and
McCormick, we conclude that there was no abuse of discretion.  In the paragraphs below, we elaborate on our
reasons for reaching this conclusion.      
            








Pojar and the dissent are correct in noting that the
Dunn opinion includes language to the effect that it is reversible error
to require two antagonistic defendants to share six strikes against a plaintiff=s six strikes. 
Id. at 918.  Nevertheless,
this was not the holding of the Dunn case.  See id.  Dunn involved one plaintiff, who got
six challenges, and four defendants, who each got six challenges.  Id. at 917.  Thus, in actuality, Dunn did not
involve two antagonistic defendants sharing six strikes, as the dissent
suggests.  Rather, Dunn involved
four defendants with 24 strikes against a plaintiff with only six strikes, a
situation much different than the one presented by the instant case.  Id. 

The language included in Dunn and relied upon
by Pojar and the dissent references the supreme court=s noteworthy holding in Tamburello.  See id. at 920 (citing Tamburello,
392 S.W.2d at 118).  Prior to Tamburello,
a refusal to allow the proper number of peremptory challenges was regarded as
immaterial in the absence of a showing that the complaining party was required
to accept one or more jurors whom he wished to challenge.  See, e.g., Wolf v. Perryman,
17 S.W. 772, 773 (Tex. 1891).  This is
the same rule applicable to errors related to challenges for cause, see
Scurlock Oil Co. v. Smithwick, 724 S.W.2d 1, 5 (Tex. 1986), and presents a
hurdle that is understandably difficult for many litigants to clear.  See Lopez v. Foremost Paving, 709
S.W.2d 643, 644 (Tex. 1986) (per curiam) (A[W]e [have] recognized that a complaining party who
has been wronged by an error in awarding of peremptory strikes theoretically
has an overwhelming burden.@). 








Although the difficult standard still applies to
errors related to challenges for cause, see Cortez ex rel. Estate of Puentes
v. HCCI‑San Antonio, Inc., 159 S.W.3d 87, 91 (Tex. 2005), the supreme
court=s decision in Tamburello Arelaxed@ the harmless-error rule as it applies to the
allocation of peremptory challenges.  In Tamburello,
the supreme court acknowledged that, in cases involving peremptory challenges,
it would be too difficult for a litigant to prove that the error probably
resulted in an improper judgment.  Tamburello,
392 S.W.2d at 117.  The supreme court
therefore relaxed the harmless-error rule and instructed reviewing courts to
focus instead on whether, given the error, Ait
reasonably appears that the trial was materially unfair.@  Id. at
118. 

In Tamburello, the supreme court concluded
that the evidence was Asharply conflicting.@  Id. 
It then noted that, if each defendant had been given six strikes, as
would have been proper, Athe jury would have been composed of six persons who
served on the jury and six other members of the panel who did not.@  Id.  The court then concluded, AA jury so constituted might well have exonerated one
of the defendants entirely, and it is our opinion that the trial was so
materially unfair that the judgment cannot be upheld.@  Id.  

Tamburello was
thus plainly based on the premise that, once antagonism between co-defendants
is discovered, each co-defendant is entitled to six peremptory challenges.  In Dunn, a case that was decided much
later, the supreme court clarified that antagonism between co-defendants does
not require exact numerical equality of peremptory challenges.  See Dunn, 592 S.W.2d at 920.  In other words, co-defendants are not each
entitled to six peremptory challenges simply because they are
antagonistic.  See id.  Nevertheless, as discussed below, Tamburello
remains important authority in this area of the law.           








Over the years, the supreme court continued to apply
Tamburello=s materially-unfair-trial test and reached other
noteworthy decisions in cases such as Roy L. Martin & Assocs., Ltd. v.
Renfro, 483 S.W.2d 845, 851B52 (Tex. 1972) and Perkins v. Freeman, 518
S.W.2d 532, 534 (Tex. 1974).  The court
ultimately relied on its precedent in Tamburello, Renfro, and Perkins
to articulate a test for reversible harm in Dunn, the primary case
relied upon by Pojar and the dissent.  See
Dunn, 592 S.W.2d at 921.  Because of
the significance of Renfro and Perkins in this regard, we pause
to briefly discuss what happened in those cases.   

In Renfro, the supreme court applied Tamburello=s materially-unfair-trial test, but this time, the
court took a slightly different approach than it did in Tamburello,
choosing not to focus on whether a properly chosen jury would have likely
reached a verdict in favor of the complaining parties.  Renfro, 483 S.W.2d at 851B52.   As in Tamburello,
the court reviewed the evidence and concluded that it was Asharply conflicting.@  Id. at 851.  It then focused on the disparity of power
created by the trial court=s error in allocating peremptory challenges.  Id. at 851B52.  The
plaintiffs were given six peremptory challenges, and the defendants were given
a total of 24 challenges, even though the defendants were not
antagonistic.  Id. at 851.  The jury pool was made up of 42 prospective
jurors.  Id.  Based on these facts, the court concluded that
the defendants were given a Atremendous advantage@ and
held that the trial was therefore materially unfair.  Id. at 851B52.

In Perkins, the supreme court also focused on
the extent of the advantage created by the error rather than on whether a
properly chosen jury would have likely reached a different result.  Perkins, 518 S.W.2d at 534.  In fact, the court held that the trial was
materially unfair without discussing any of the evidence or concluding that the
evidence was Asharply conflicting.@  Instead, the court based its decision on the
absence of any antagonism between the defendant and intervenors, who were each
awarded six peremptory challenges.  Id.
 The court noted that the plaintiff
only received six challenges and concluded that the defendant and intervenors
were therefore given an Aunequal advantage.@  Id.  The court then held that the Aunequal advantage@
rendered the trial Amaterially unfair.@  Id.








In Dunn, the supreme court relied on Tamburello,
Renfro, and Perkins to explain, in slightly different terms, how
the materially-unfair-trial test is to be applied to errors related to the
allocation of peremptory challenges:

 

Whether any such error resulted in a materially
unfair trial . . .  must be decided from
an examination of the entire trial record. 
For example, in a case in which the complaining party failed to prove
his cause of action or defense, an error in allocating or equalizing strikes
could not be said to have resulted in a materially unfair trial.  On the other hand, when the trial is
contested and the evidence is sharply conflicting, the error results in a
materially unfair trial without showing more.

 

Dunn,
592 S.W.2d at 921.  

The supreme court and intermediate appellate courts
currently use this statement of the law (Athe Dunn test@) as a
test for reversible harm.  See Garcia,
704 S.W.2d at 737 (applying the Dunn test).  The Dunn test appears to differ
somewhat from the approaches taken in Tamburello, Renfro, and Perkins,
which each considered the extent of the unfair advantage created by the trial
court=s allocation of challenges.   








Notably, most, if not all, errors evaluated under Dunn=s reversible-error test have led to reversal.[5]  This trend appears to follow from the test=s exclusive focus on whether the trial was Ahotly contested@ and the evidence Asharply
conflicting,@ rather than on the extent to which an unfair
advantage was actually created by the allocation of challenges.  Consider, for instance, the scarce number of
cases that actually reach a jury verdict that are not Ahotly contested.@  And, of course, if the evidence were anything
other than Asharply conflicting,@ the
central issue on appeal would not likely be a remand point such as allocation
of peremptory challenges but probably a rendition point such as legal
sufficiency of the evidence.  Thus, the Dunn
test, which began as a Arelaxed@ harmless-error rule, has become a virtual rule of
automatic reversal.  We are unaware of
any error in the allocation of peremptory challenges that has ever survived the
Dunn test.       

We do not suggest that this Court should denounce
the Dunn test or somehow side-step it. Instead, we simply note our
concern that, in applying the Dunn test, some courts have inadvertently
relaxed the complaining party=s initial burden of showing actual error.  In particular, we are concerned that, in not
joining today=s decision, the dissent has overlooked the
considerations of fairness articulated not only in Dunn but also in Tamburello,
Renfro, Perkins, and rule 233. 
We believe these considerations remain an integral part of today=s jurisprudence. Whether an unfair advantage was
created by the trial court=s allocation of challenges is a preliminary question
that must be answered to determine whether the trial court actually erred.   The supreme court made this very clear in Dunn,
which included an extensive discussion of the trial court=s discretion to allocate peremptory challenges to
promote the Aends of justice@ and the elimination of Aunequal advantage.@  Dunn, 592 S.W.2d at 919B20.     








Notwithstanding rule 233 and the foregoing
precedent, reviewing courts all too often neglect to discuss the trial court=s discretion, rarely spending more than a word on
the issue of fairness.  In not joining
today=s decision, for instance, the dissenting justice
states that he would find reversible error; however, he does not discuss how
the trial court=s allocation of peremptory challenges actually
created an unfair advantage, nor does he provide the trial court with any
guidance on how to allocate challenges on remand to avoid a second
reversal.  This is particularly ironic
because, in reaching its ruling, the trial court expressly noted the
uncertainty created by this Court=s precedent in Wendt, which also failed to
provide guidance on how to equalize peremptory challenges to avoid
reversal.  See Wendt, 718 S.W.2d
at 770.

We believe that the trial court did not abuse its
discretion.  The nature and degree of the
antagonism and its effect on the number of peremptory challenges allocated to
each litigant or side are matters left to the discretion of the trial
court.  Brundige, 813 S.W.2d at
556; Webster, 787 S.W.2d at 638. 
No bright-line rule governs the trial court=s discretion, but this much is clear:  equalization does not mean exact numerical
equality.  Dunn, 592 S.W.2d at
920.  The advancement of the ends of
justice and the elimination of unfair advantage remain the safest guideposts
for the courts, ever reminding us that, above all, the jury selection process
should never be one-sided.  








In this case, the trial court=s allocation of challenges and instructions
regarding how the challenges could be exercised were calculated to eliminate
the possibility that an unfair advantage would arise from the antagonism
between the co-defendants.  The court
accounted for the antagonism by allocating separate strikes to each defendant
rather than giving them six to share. 
Numerical equality of challenges is not required, and thus, the fact
that each defendant received only three challenges as compared to the plaintiff=s six does not ipso facto establish an abuse
of discretion.  See Dunn, 592
S.W.2d at 920.

The co-defendants were not forced to share their
strikes, but they were given the option to collaborate if they desired to do
so.  Inherent in this ruling is a finding
that despite the chumminess between Cifre and McCormick, the co-defendants
still had an overriding common interest in defeating Cifre=s claims against them, even if this common interest
were strictly limited to the issue of damages. 
The chumminess, in turn, was accounted for by the trial court=s specific instruction forbidding Cifre and
McCormick from working together in exercising their challenges.  The trial court thus attempted to minimize
the possibility that an unfair advantage would arise.

Although the supreme court found reversible error in
a somewhat similar situation in Tamburello, as discussed above, that
decision was premised on case law holding that, once antagonism is discovered,
the litigants are each entitled to exactly six strikes.  Tamburello, 392 S.W.2d at 116.  The supreme court has since explained that
exact numerical equality is not required. 
Dunn, 592 S.W.2d at 920. 
According to the supreme court, the extent to which equalization is
required depends upon the circumstances of the particular case, the information
available to the trial court, the extent and degree of the antagonism, whether
the parties collaborate in selecting jurors to be struck, the number of jurors
available on the panel, and such other considerations as meet the criteria of
promoting the Aends of justice@ and preventing Aunequal
advantage.@  Id.  The supreme court then noted the
following:   

[I]n most cases a two‑to‑one ratio
between sides would approach the maximum disparity allowable. In cases in which
the disparity between strikes allowed the two sides did not exceed a two‑to‑one
ratio, courts have held that there was no abuse of discretion. On the other
hand, a disparity of four‑to‑one between sides has been held
erroneous.  








Id. (citations
omitted).  In Dunn, the court was
faced with a four-to-one disparity, which it held was erroneous.  Id.  

This case would involve a three-to-one disparity, if
we were to consider Cifre and McCormick as one side with a total of nine
challenges and Pojar as the other side with only three challenges.  But that estimate is incorrect because it
neglects to account for the trial court=s instruction forbidding any cooperation between
Cifre and McCormick.  These litigants
were not allowed to act as a single side in selecting a jury, and there has
been no allegation on appeal that they did so in violation of the trial court=s instruction.  
It is therefore inappropriate to consider them as one side in estimating
the disparity in the allocation of peremptory challenges.  The disparity ratio is thus closer to
two-to-one-to-one, considering that Cifre had six challenges, Pojar had three
challenges, and McCormick had three challenges.    

Regardless of how the ratios are calculated, even
the estimate that favors Pojar the most places this case in the gray area
between the allowable two-to-one ratio and the erroneous four-to-one
ratio.  In light of the instructions given
by the trial court, we conclude that the disparity created by the court=s allocation of peremptory challenges was an
allowable ratio. 

It is settled in Texas that an abuse of discretion
does not exist merely because an appellate court would have decided a
discretionary issue differently than the trial court.  See, e.g., M.N.G., 147
S.W.3d at 530.  Affording all due respect
to the trial court=s discretion in allocating peremptory challenges, we
conclude that no reversible error has been shown.  

Pojar=s first issue is overruled. 








III.  Evidence
of Marijuana Use 

In his second issue, Pojar contends that the trial
court abused its discretion by admitting evidence of marijuana use.  The complained-of evidence is presented in
four different categories: 

(1)       Evidence
that Pojar had marijuana metabolites in his urine;

 

(2)       Evidence
that Pojar had smoked an unknown quantity of marijuana on the night in
question, of an unknown quality, and at an unknown time before driving;

 

(3)       Evidence
that Pojar had smoked marijuana in the past; and 

 

(4)       Evidence
that Pojar had a A4:20@ bumper sticker, which expressed ill-defined but
generally positive feelings about marijuana. 

 

Pojar argues that he is entitled to a new trial
because this evidence was irrelevant and unfairly prejudicial.  See Tex.
R. Evid. 401, 403.  In response,
Cifre contends, inter alia, that Pojar failed to object to the evidence
and that no issues regarding its admission were preserved for appellate
review.  Pojar maintains that the issues
were preserved because he secured a running objection to the disputed evidence
prior to its admission and outside the presence of the jury.  See Tex.
R. Evid. 103(a)(1). 

            Having reviewed the record, we conclude
that Pojar waived all objections, and thus any error, related to the admission
of evidence in the first, third, and fourth categories.  Accordingly, we need not decide whether Pojar
adequately objected to this evidence.  See
Tex. R. App. P. 47.1.    








In the analysis that follows, we first demonstrate
how Pojar waived his objections (assuming they were adequate) to evidence in
the first, third, and fourth categories. 
We then address the second category of evidence and discuss how Pojar=s objection to that category of evidence was
inadequate to preserve error for appellate review.  See Tex.
R. App. P. 33.1(a). 

A.  Marijuana
Metabolites

Pojar complains that the trial court erred by
admitting evidence that marijuana metabolites were discovered in his urine
after the accident, but the record shows that his attorney was the first to
mention this evidence at trial.  Counsel
discussed the evidence during his opening statement, after the trial court had
granted him a running objection to any mention of marijuana use by Scott Pojar.[6]  

For the sake of clarity, we begin with what Cifre=s attorney said about marijuana during his opening
statement, which came first, and then turn to what the other attorneys said in
their opening statements.  








After discussing the evidence he would produce to
prove that Scott Pojar caused the accident by either running a red light or
failing to keep a proper look out, counsel for Cifre turned his attention to
Jamie McCaughey and his testimony as an eyewitness in support of Scott Pojar=s version of events: 

Counsel for Cifre:  But Mr. McCaughey admits he
smoked marijuana that night.  In the two
hours previous to the accident.  They
admit 2:00 in the morning and he admits he smoked marijuana and admits he drank
alcohol.  At a minimum he drank a 32
ounce beer.  For those of you who don=t know how big that is, it is almost three beers. 

            

Mr. McCaughey claims he is positive this was a green
light, positive he was awake, positive he was alert, and positive he is not
mistaken.  Those are not the
characteristics of people smoking marijuana and drinking alcohol.  I am not asking you [to] decide the case on
the entire prejudice of drugs and alcohol, but I am asking you to decide the
case on the facts about who=s accurate in what they found.  I am asking you to do that and I am asking
you to tell me about it. 

 

Mr. Pojar denies consumption that evening, and you
will hear testimony about that, expect you will hear about it during
trial.  But that, in a nutshell, is what
we=re going to be trying to establish to you with the
evidence.  What I said is not
evidence.  You should put the burden on
me to bring what I said I would bring.

 

I will be going through witnesses, for example,
friends of theirs with them that night. 
Friends of theirs that will testify about drugs and marijuana use.  That=s not my proffered order of witnesses, but they are
under subpoena and have jobs so I am trying to get them on so you can hear
their testimony; okay?   

 








In his opening statement, Cifre=s attorney never mentioned any evidence of marijuana
metabolites in Scott Pojar=s urine or the results of any drug test.  Nor did counsel mention or suggest he would
present any expert testimony on toxicology. 
Counsel primarily focused on Jamie McCaughey and whether his eyewitness
testimony was believable given that he admitted using marijuana and alcohol on
the night of the accident.  Counsel
suggested that the jury would hear testimony about whether Scott Pojar used
marijuana on the night of the accident, but this evidence was limited to the
testimony of Afriends of theirs with them that night.@  Counsel was
careful to avoid directly accusing Scott Pojar of using marijuana or telling
the jury that he would present conclusive, scientific proof on the issue. 

Counsel for McCormick was next to give an opening
statement.  He did not discuss any evidence
related to marijuana metabolites or Scott Pojar=s use
of marijuana on the night of the accident or in the past.  

Finally, Pojar=s attorney gave an opening statement.  He began by bringing up the evidence of
marijuana metabolites: 

Counsel for Pojar:             The fact is Scott
Pojar had metabolites of marijuana in his urine.  You will hear testimony in the case.  Even the hired expert for the plaintiffs
agrees marijuana in your urine is not in your body, not in your system, it is
not effecting [sic] you.  You will hear
scientific evidence with regard to marijuana. 

 

We believe counsel=s
preemptive injection of marijuana metabolites at trial is fatal to the
sub-issue on appeal.  As shown above,
Pojar= s attorney was the first to raise the issue before
the jury.  In fact, during the course of
the trial, counsel for Cifre never introduced any evidence of marijuana metabolites
and did not call any expert witness to testify about marijuana, marijuana
metabolites, or toxicology. 








A party on appeal may not object to the admission of
incompetent evidence that he offered or brought out that related to an issue
which he first injected into the case.  See
McInnes v. Yamaha Motor Corp., 673 S.W.2d 185, 187B88 (Tex. 1984); Varel Mfg. Co. v. Acetylene
Oxygen Co., 990 S.W.2d 486, 499 (Tex. App.CCorpus
Christi 1999, no pet.); Pouncy v. Garner, 626 S.W.2d 337, 340 (Tex. App.CTyler 1981, writ ref=d
n.r.e.); Hughes v. State, 302 S.W.2d 747, 750 (Tex. Civ. App.CEastland 1957, writ ref=d n.r.e.). 
Counsel for Pojar was not only the first to mention marijuana
metabolites to the jury, he also called Brenda Pojar as a witness and she gave
the following testimony on direct examination:

 

Counsel for Pojar:             While
you were there at the hospital, did you become informed that they had found
metabolites of marijuana in his [Scott Pojar=s]
urine?

 

Brenda Pojar:                      Yes.

  

Counsel for Pojar:             Did that upset you?

 

Brenda Pojar:                      Yes.

 

Counsel for Pojar:             Did you get an
opportunity to talk to him about that?

 

Brenda Pojar:                      Not in the
hospital. 

 

Counsel for Pojar:             Okay.  But you and Ron confronted him with that?

 

Brenda Pojar:                      Yes.

 

Based on counsel=s
preemptive statements to the jury and the testimony he offered from Brenda
Pojar on direct examination, we conclude that Pojar waived any objection, and
thus any error, regarding the admission of evidence that marijuana metabolites
were found in Scott Pojar=s urine.  See McInnes, 673 S.W.2d at 187B88; Varel Mfg., 990 S.W.2d at 499; Pouncy,
626 S.W.2d at 340; Hughes, 302 S.W.2d at 750.   

B.  Past Use
of Marijuana   








Counsel for Pojar was also the first to inform the
jury that Scott Pojar had used marijuana before the night of the accident.  He then produced direct testimony to prove
the history of marijuana use.  On appeal,
Pojar complains that the evidence of past use of marijuana was
inadmissible.  Again, we find that any
error was waived.  See McInnes,
673 S.W.2d at 187B88; Varel Mfg., 990 S.W.2d at 499; Pouncy,
626 S.W.2d at 340; Hughes, 302 S.W.2d at 750.   

In his opening statement, counsel for Pojar informed
the jury that Scott Pojar had used marijuana approximately 27 hours before the
accident.  Counsel suggested that this
use of marijuana did not impair Scott Pojar on the night of the accident and
that it explained the presence of marijuana metabolites in Scott Pojar=s urine on the day after the accident.  These remarks appear to be an effort by
counsel to soften the blow or remove the sting of the evidence of marijuana
metabolites; however, no such evidence had been mentioned to the jury by anyone
or admitted into evidence prior to counsel=s remarks.   

The record shows that counsel for Pojar was the
first to inform the jury that Scott Pojar had a history of marijuana use that
preceded the night of the accident. 
Counsel for Pojar also introduced substantial evidence of Scott Pojar=s past use of marijuana and his preferences in using
marijuana.  

For instance, Brenda Pojar gave the following
testimony on direct examination:  

Counsel for Pojar:             At any time in the past had he ever smoked
marijuana?

 

Brenda Pojar:                      Yes. 

 

Counsel for Pojar:             How did you find out
he even knew anything about marijuana?

 








Brenda Pojar:                      I overheard
a phone conversation he was having.  And
I don=t  remember
exactly what I heard, but I heard marijuana and I confronted him about it.

 

Counsel for Pojar:             Did
you‑all extract a promise that he would not do that again?

 

Brenda Pojar:                      Yes. 

 

Counsel for Pojar:             Did he break that
promise?

 

Brenda Pojar:                      Yes.  

 

Counsel for Pojar also offered the following
testimony from Jamie McCaughey on direct examination:

 

Counsel for Pojar:             Okay.  But when you were smoking dope before this
[accident]  happened, it would not be
unusual for you to smoke four or five joints?

 

Jamie McCaughey:            Four or five sweets actually.  

 

Counsel for Pojar:             Okay.  What=s a sweet?

 

Jamie McCaughey:            Blunts?

 

Counsel for Pojar:             Bigger
joints?

 

Jamie McCaughey:            Yeah.

 

Counsel for Pojar:             Okay.  And that would also be on occasions when you
were with Mr. Pojar?

 

Jamie McCaughey:            No, we only smoked bowls.  He didn=t like smoking joints. 

 

Counsel for Pojar:             Okay.  What=s a bowl?

 

Jamie McCaughey:            Like a little pipe. 
Little bit in it because he didn=t like getting high because he always had to go home
and check in or something. 

 

Counsel for Pojar:             Okay.

 








Jamie McCaughey:            He didn=t like getting high.

 

Counsel for Pojar:             Okay.  The ‑ ‑ when was the last time ‑
‑ I guess you smoked dope with Mr. Pojar that Friday before [the accident
which occurred early Sunday morning]?

 

Jamie McCaughey:            Uh‑huh.

 

Counsel for Pojar:             In truth and fact
whenever you and him split up on Friday night ‑ ‑ what time did you
and him split up on Friday night?

 

Jamie McCaughey:            About 12:00. 
He had to go to work the next morning. 
So, he went home.

 

Counsel for Pojar:             Okay.  So y=all were smoking dope up until 12:00 midnight on
Friday night?

 

Jamie McCaughey:            No, we weren=t smoking all day. 
We smoked like ‑ ‑ we smoked about two hours before we went
home.  So, his parents wouldn=t know he was high.

 

Counsel for Pojar:             Okay.

 

Jamie McCaughey:            So, he smoked a bowl; and that=s about all he smoked.

 

Given counsel=s preemptive injection of the issue of past
marijuana use in his opening statement and his subsequent offer of evidence on
the same subject, we conclude that any objections, and thus any error, related
to the admissibility of such evidence were waived.  See McInnes, 673 S.W.2d at 187B88; Varel Mfg., 990 S.W.2d at 499; Pouncy,
626 S.W.2d at 340; Hughes, 302 S.W.2d at 750.   

C.  A4:20@ Bumper Sticker








Pojar also complains of evidence that his vehicle
had a A4:20@ bumper sticker on its rear windshield.  Before trial, Pojar filed a motion in
limine regarding evidence that Athe automobile driven by Scott Pojar did or did not
have a bumper sticker relating to the issue of Marijuana for the reason that
said evidence is highly prejudicial and not relevant to any issue in this case.@  At a hearing
on Pojar=s motion, counsel for Cifre explained that A4:20 is an old police code for marijuana, and there
is a web site that talks about the legalization of marijuana and [that] there
is an organization [promoting its legalization].@  Counsel for Pojar then asked, AWhat=s it relevant to?@  Counsel for Cifre gave a detailed response,
explaining how the evidence was relevant to the claims of negligent entrustment
against Brenda Pojar and negligence against Scott Pojar, as well as issues
related to punitive damages.[7]    

 

The trial court overruled Pojar=s motion in limine as it related to the A4:20" bumper sticker.  No further objections were made specifically
to the A4:20@ bumper sticker, though the trial court subsequently
granted a running objection Ato any mention of marijuana usage by Mr. Pojar.@  See footnote
6.  








As a preliminary matter, we question whether Pojar
preserved any error regarding the complained-of evidence.  A ruling on a motion in limine is not
a ruling on the admissibility of evidence and does not preserve error.  Huckaby v. A.G. Perry & Son, Inc.,
20 S.W.3d 194, 203 (Tex. App.CTexarkana 2000, pet. denied); Southwest Country
Enter., Inc. v. Lucky Lady Oil Co., 991 S.W.2d 490, 493 (Tex. App.CFort Worth 1999, pet. denied); Glenn v. Kinco
Crane, Inc., 836 S.W.2d 646, 648 (Tex. App.CHouston
[1st Dist.] 1992, no writ). 
Consequently, the trial court=s denial of Pojar=s
motion in limine did not preserve the complaint now raised on
appeal.  

If an issue was preserved, it was by Pojar=s running objection. 
In footnote 6, we documented the exchange that led to the running
objection.  In that exchange, there was
no specific reference to the A4:20@ sticker or any discussion of its
admissibility.  To preserve error, Aa running objection is required to be specific and
unambiguous.@  Volkswagen
of Am., Inc. v. Ramirez, 159 S.W.3d 897, 904 (Tex. 2004); Huckaby,
20 S.W.3d at 203.  We believe that Pojar=s running objection Ato any
mention of marijuana usage@ was unambiguous, but we question whether it was
sufficiently specific to make the trial court aware of his specific objections
to the A4:20@ bumper sticker. 
See Tex. R. App. P.
33.1(a).[8]








Although we question the adequacy of Pojar=s objection, we conclude that such considerations
are of little consequence because Pojar subsequently waived any objection at
trial.  In explaining our basis for
reaching this conclusion, we emphasize how the A4:20@ evidence was produced at trial.  The first reference to it was made on
re-cross-examination of Joshua Cast, a witness called by Cifre.  Counsel for McCormick raised the issue of
whether there was a bumper sticker on Scott Pojar=s
car.  Then, on re-direct examination,
counsel for Cifre introduced, without objection, a picture of the bumper
sticker on Scott Pojar=s car and additional testimony about its meaning:

 

Counsel for McCormick: You said you
had been in Mr. Pojar=s car?

 

Joshua Cast:                                   Yes,
sir. 

 

Counsel for McCormick:              Did you
notice the sticker he had on the back windshield?

 

Joshua Cast:                                   No,
sir.

 

Counsel for McCormick:              You never saw the 4:22 [sic] sticker on the back of his
windshield?

 

Joshua Cast:                                   No,
sir. 

 

Counsel for McCormick: Do you know what 4 - -
4:20 [means]?

 

Joshua Cast:                                   Yes,
I do know what that means.

        

Counsel for McCormick: What does it
mean?

 

Joshua Cast:                                   It=s a smoking thing.

 

Counsel for McCormick: Smoking
marijuana thing?

 

Joshua Cast:                                   Yes,
sir. 

 








Counsel for McCormick: Meaning you
agree with it?

 

Joshua Cast:           
                       Yes,
sir.

 

Counsel for McCormick: Meaning you
think it ought to be legalized?

 

Joshua Cast:                                   Yes,
sir.

 

Counsel for McCormick: Did you know
Mr. Pojar had the sticker on the back of his windshield?

 

Joshua Cast:                                   No,
sir.

 

Counsel for McCormick: Would you be
surprised to learn that?

 

Joshua Cast:                                   Not
very.

 

Counsel for McCormick: You are not
surprised because you knew he agreed with it, didn=t you?

 

Joshua Cast:                                   Yes,
sir. 

 

Counsel for McCormick: Pass the
witness

 

Counsel for Cifre:              I
have a follow-up to that.

 

The Court:                                        [It
is Pojar=s] turn. 

 

Counsel for Pojar:                         Nothing
further.

 

Counsel for Cifre:              Your
Honor, I would offer in evidence Plaintiff=s No. 113A, a photograph of Mr. Pojar=s car after the accident.

 

The Court:                                        Any
objection?

 

Counsel for Pojar:                         No.


 

Counsel for McCormick:              No.

 

The Court:                                        Admitted

 

Counsel for Cifre:                          Does
this look like Scott=s car? 








Joshua Cast:                                   Yes.


 

Counsel for Cifre:              See
the bumper sticker?

 

Joshua Cast:                                   Yes.


 

Counsel for Cifre:              Says
4, colon, 20?

 

Joshua Cast:                                   Yes.

 

Counsel for Cifre:              You
all refer to that as 4:20. [Counsel for McCormick] shows how out of touch he
is.  He said 4:22.  

 

Joshua Cast:                                   Yes.


 

Counsel for Cifre:              What
is 4:20?  I am sure Mr. Williams is happy
not to be in touch with this part of the culture, but what is 4:20?  I didn=t know either, didn=t ring
a bell until a few days ago.  What is
4:20?

 

Joshua Cast:                                   I
don=t really know how to explain it.

 

Counsel for Cifre:              Kind
of a code word?

 

Joshua Cast:                                   Kind
of.

 

Counsel for Cifre:                         What=s it a code word for?

 

Joshua Cast:                                   Going
to smoke.  Smoking.

 

Counsel for Cifre:                          Smoking
what?

 

Joshua Cast:                                   Marijuana.

 

Counsel for Cifre:              Okay.  And if you know is there a website at 420
website?

 

Joshua Cast:                                   I
am pretty sure it is. 

 

Counsel for Cifre:              It
talks about legalizing it?

 

Joshua Cast:                                   Yes,
sir. 








Counsel for Cifre:              Part
of the movement to legalize marijuana?

 

Joshua Cast:                                   Yes,
sir.

 

Counsel for Cifre:              So
that=s a sticker I guess you are advocating use or
legalization of marijuana as a substance?

 

Joshua Cast:                                   Yes.


 

Counsel for Cifre:              You just never
noticed it on Mr. Pojar=s car?

 

Joshua Cast:                                   No.


 

Counsel for Cifre:              Is it a good idea to
put it in on your car?

 

Joshua Cast:                                   Probably
not.

 

Counsel for Cifre:              Why
not?

 

Joshua Cast:                                   Because
I am sure police officers know what it means, too.

 

Counsel for Cifre:              Did
you know, Mr. Cast, that 420 is actually an old police code for marijuana?  That=s where it picks up off of?

 

Joshua Cast:                                   I
didn=t know that.

 

Counsel for Cifre:              Way
they call in different codes for different types of offenses?

 

Joshua Cast:                                   Yes.


 

Counsel for Cifre:              I
pass the witness.

        








Counsel for Pojar not only failed to object to the
testimony regarding the meaning of the A4:20@ bumper sticker, he affirmatively stated that he had
Ano objection@ to the admission of a photograph depicting the
bumper sticker.  If a party affirmatively
asserts during trial that he or she has Ano objection@ to the admission of the complained‑of
evidence, any error in the admission of the evidence is waived, even in the
face of a pretrial ruling.  Tex. DOT
v. Pate, 170 S.W.3d 840, 850 Tex. App.CTexarkana 2005, no pet.); In re R.S.C., 940
S.W.2d 750, 752 (Tex. App.CEl Paso 1997, no writ); see Duperier v. Tex.
State Bank, 28 S.W.3d 740, 755B56 (Tex. App.CCorpus Christi 2000, no pet.) (emphasizing counsel=s statement that he had Ano objection@ to the complained-of evidence in holding that any
objection in its admission was waived). 
Accordingly, we hold that Pojar waived any error regarding the admission
of evidence related to the A4:20@ bumper sticker.[9]


D.  Evidence
of Scott Pojar=s Marijuana Use on the Night of the Accident








Finally, Pojar contends that the trial court erred
by admitting evidence that he had used marijuana on the night of the
accident.   Specifically, Pojar complains
that a witness called by Cifre was allowed to testify that she saw Scott Pojar
smoke marijuana before the accident. 
Counsel for Pojar did not object to the testimony at the time it was
offered, but as noted above, the trial court had previously granted a running
objection Ato any mention of marijuana usage by Mr. Pojar.@  On appeal,
Pojar argues that the eyewitness testimony was inadmissible under rules 401 and
403.  See Tex. R. Evid. 401, 403. 


As a preliminary matter, we must decide whether
Pojar preserved any error in the admission of this testimony.  See Tex.
R. App. P. 33.1(a).  Pojar=s running objection is quoted in footnote 6.   Although the objection unambiguously covered
Aany mention of marijuana usage by Mr. Pojar,@ the grounds for the objection were not specified at
the time it was granted.  Instead,
counsel asked the trial court to recognize the grounds raised in his previous
objections to the evidence, which the court apparently agreed to do.  Consequently, to determine whether Pojar made
adequate 401 and 403 objections to the eyewitness testimony, we must examine
his earlier objections, which became running objections.  See Tex.
R. Evid. 401, 403.

Counsel for Pojar made objections to the evidence of
marijuana use on five separate occasions: 
(1) at a pre-trial hearing on the jury questionnaires; (2) at a second pre-trial
hearing on the jury questionnaires; (3) at a hearing on a motion in limine filed
by Pojar; (4) during voir dire; and (5) prior to opening statements,
when the trial court granted the running objection quoted in footnote 6.  

None of the objections specifically addressed the
admissibility of eyewitness testimony that Scott Pojar used marijuana on the
night of the accident.  Counsel expressed
his general objection to any evidence of marijuana use, but he never
specifically objected to the eyewitness testimony that was ultimately produced
by Cifre at trial.  Based on the
following review of the record, we conclude that Pojar failed to preserve any
error in the admission of eyewitness testimony that he used marijuana prior to
the accident.  See Tex. R. App. P. 33.1(a).        








The following exchange occurred during the first
pre-trial hearing on the jury questionnaires:

The Court:                            You are saying that
you think that mentioning marijuana with respect to Mr. Pojar shouldn=t happen at all?

 

Counsel for Pojar:             Yes,
ma=am.  Yes, Your
Honor.  The evidence is when [counsel for
Cifre] talks about his theory in this case, his theory in this case with regard
to marijuana and Scott Pojar is that 27 hours after ingestion he is
impaired.  

 

*   *    *

 

Counsel for Pojar:             The critical fact, I will be very, very candid, the
critical fact is marijuana metabolites were found in Scott=s system the morning after the accident.  That=s the critical thing because it=s entirely consistent with him not having consumed
for 27 hours.  The medical literature
states 27 hours out it will not have effect on him. 

 

Counsel for Cifre: That=s not true.

 

Counsel for Pojar:             There
are studies with regard to airplane pilots. 
                         

That=s what he is citing. Anyway, the very damaging part
is the urine - - I mean, the metabolites in the urine. It is so prejudicial
that that=s what I am seeking to exclude.

 

*   *   *

 

The Court:                            Okay. Well, I am
certainly going to let the fact that he tested positive for marijuana and
smoked it in the car come in. 

 

We will look at the Daubert stuff but I can=t imagine the jury not knowing that with as much
evidence as there is of marijuana usage going on in the car that they ought to
get their own conclusions. 








 

Although counsel objected to any mention of Scott
Pojar=s use of marijuana, he did so based on the unfairly
prejudicial effect created by the evidence of marijuana metabolites.  See Tex.
R. Evid. 403.  Counsel specified
that, in his opinion, Athe very damaging part is the . . .  metabolites in the urine.  It is so prejudicial that that=s what I am seeking to exclude.@  Counsel
never discussed or specifically objected to eyewitness testimony that Scott
Pojar used marijuana on the night of the accident. 

At a second pre-trial hearing on the jury
questionnaire, the trial court again considered the admissibility of the evidence
of marijuana use:

The Court:                            I thought that what
we said last week was if I was going to let it in there was marijuana found in
the car and marijuana found in . . . Mr. Pojar=s
system.

 

Counsel for Pojar:             Urine,
more specifically.

 

The Court:                            That
there was marijuana found in his urine, and no matter when it was ingested I
was going to allow the jury to weigh all of that; that you had no objection to
the questionnaire, per se, but you objected to that coming in, the fact that he
had marijuana in his urine and marijuana was found in his car. 

 

Counsel for Pojar:             Your
Honor, I think that=s fairly close. . . 
For the record, . . . we would object to questions 31 through 43 on the
grounds that this improperly puts before the jury the issues of drugs as
regards the accident in question.

 








The basis for this objection is that the only
apparent basis for inquiring about drugs as to my client Scott Pojar is the
finding of metabolites of marijuana in the hospital after the accident, and the
science indicates that that is not evidence of impairment and, therefore, is
not only very, very prejudicial but it=s immaterial to any issue in this case. 

 

And I guess I would ask the Court to rule on that
first.

 

The Court:                            That=s overruled. 

 

Counsel for Pojar:             Secondly,
. . . we would ask the Court to treat this as a separate objection because the
only basis for questions 33, 34 through 40, 42, and 43 would be the evidence of
marijuana in Scott Pojar=s urine after the accident, and that there is no
evidence or credible evidence of scientific evidence to suggest that is an
indication of impairment at the time of the accident, and therefore, is
immaterial and very prejudicial to defendant Scott Pojar.

 

The Court:                            Okay.  That=s overruled.  

 

Again, counsel for Pojar based his objection on the
incompetency of marijuana metabolites to prove impairment at the time of the
accident.  Counsel never suggested that
the question of impairment was irrelevant or unfairly prejudicial.  Counsel took issue with how, in his opinion,
opposing counsel would seek to prove impairment at trial, not with whether
evidence of impairment was irrelevant or unfairly prejudicial.[10]  Pojar=s attorney repeatedly suggested to the trial court
that the only evidence of impairment would be the marijuana metabolites and
that such evidence was necessarily incompetent and therefore irrelevant and
unfairly prejudicial. 








The admissibility of marijuana evidence was raised a
third time at a hearing on Pojar=s motion in limine,[11]
at which time, counsel for Cifre specifically advised the court and opposing
counsel that he intended to establish impairment by producing eyewitness
testimony that Scott Pojar used marijuana on the night of the accident:

 

Counsel for Pojar:             [A]s
to 19 and 20, Your Honor. 

 

21, I guess, starts to delineate how far we go with
all this business.

 

The Court:                            Okay.  Well, I have . . . denied 19 and 20, and then
tell me is this here something that happened or argued to have happened before
the accident?

 

Counsel for Pojar:             Yes.

 

*   *   * 

 








Counsel for Cifre: When they got
there [to the house where they were before the accident] it is admitted by Mr.
McCaughey and Mr. Young [that they] both got a 32 ounce beer . . . ; that Mr.
McCaughey and Mr. Young got there and there was some question whether there was
drug use there, namely marijuana use, in addition to the alcohol which would,
of course, corroborate why they went by there [allegedly to obtain
marijuana].  Then they leave that house
at some point in time [and get into the accident].

 

I believe the testimony may be conflicting whether
they got drugs there or not.  Mr. Pojar
says there was [sic] no drugs there; he didn=t do
any.  Mr. McCaughey says there was [sic]
no drugs there; he didn=t do any.  And
they left to take Mr. Young home but they did alcohol there. 

 

The Court:                            Who
says they did drugs there?

 

Counsel for Cifre: I believe I
have two witnesses, Your Honor, who both said they smoked marijuana at the
house.

 

Counsel for Pojar:             They
being the witnesses themselves?

 

Counsel for Cifre: No, they being Jamie McCaughey and/or possibly Scott
Pojar.  By the way, this is not hiding
out.  I took one of those statements last
night and I told [counsel for Pojar] about it this morning, lest the Court
think I am sandbagging him.  I took the
statement last night on the way to Galveston. 
I don=t have it transcribed yet.  He said Jamie McCaughey smoked dope there and
another witness, I believe, Your Honor, I anticipate is going to testify via
statement but I believe we will have a statement that said Jamie McCaughey and
Scott Pojar smoked dope, so the evidence is conflicting.

 

The Court:                            I will grant it
[referring to item 21] until I know more [about] what the evidence is. 

 

Counsel for Pojar:             Right.
And it talks about intent, anyway, whether the conduct - - conduct may be a
different thing, but going there with intent seems to be something beyond
evidence.

 

Counsel for Cifre: Driving around
Galveston County looking for marijuana is not a reasonable thing to be
doing.  Goes to the facts and
circumstances.

 








The Court:                            Goes to - - there is
a hotly contested issue [of] whether Scott was smoking dope that night, but I
just need to hear more about it before I can - - 

 

Counsel for McCormick:  The only thing I would
add no different from any other car accident, AWhere
were you on the day of the accident and what did you do,@ it=s the same type of evidence. 

 

The Court:                            Except it=s so prejudicial we have got to be careful with it. 

 

Counsel for Cifre: It does,
Judge.  It goes to the issue of punitive
damages and entrustment. 

 

The Court:                            Jamie
was the one [who] said that=s what we intended to do, not Scott?

 

Counsel for Cifre: Scott was
driving.  It was his car and he was
driving.

 

The Court:                            I
am saying from what you have already told me about Jamie he has been a little
inconsistent.  I want to make sure we are
not in a position [where] you ask a question and he says, ANo,@ and that=s all we have.

 

Counsel for Cifre: I see what you
are saying.

 

Counsel for Pojar:             Yes,
Your Honor. I understand the Court=s ruling and I will absolutely abide by it. 

 

Mr. McCaughey said two separate statements.  That=s the specific reason, and Mr. McCaughey on separate
statements said Scott wanted to go by there, get more weed, and mid-sentence
says we wanted to go by and get more weed.

 

The Court:
                           It=s probably coming in, but I will grant the motion in
limine and, obviously, we will have to talk with Jamie before he goes on. 

 








It appears that, during this exchange, counsel for
Cifre revealed for the first time that he had eyewitnesses who would testify
that Scott Pojar and Jamie McCaughey used marijuana immediately prior to the
accident.  Although counsel for Pojar
acknowledged this new evidence, he did not raise an additional objection to
it.    

Instead of objecting to the eyewitness testimony,
counsel focused on item 21 of his motion in limine, which concerned the
reason for the teenagers= visit to the house before the accident.  Counsel for Pojar did not want the jury to
hear that his client and his client=s friends were apparently looking for
marijuana.  The trial court granted the
motion in limine as it related to this testimony, but the testimony was
ultimately admitted at trial. 

During voir dire, an objection to the issue
of marijuana use was again made by counsel for Pojar:

 

Counsel for Cifre: Okay. All of
you need - - there were questions about marijuana, alcohol, and drugs in that,
correct?

 

Counsel for Pojar:             Your
Honor, I hate to interrupt argument, but for the record I object to any
reference to marijuana. 

 

The Court:
                           That objection
is overruled and you may have a running objection. 

 

Counsel for Pojar:             Thank
you. I just wanted to bring it to the attention of the Court.  Thank you, very much.   

 

Pojar=s final objection to the evidence of marijuana use
was made prior to opening statements.  We
have documented this objection in footnote 6. 
As mentioned above, Pojar=s final objection did no more than incorporate his
previous objections.  No new objections
were added.  








From this review of the record, we conclude that
Pojar never specifically objected to the eyewitness testimony that he used
marijuana on the night of the accident. 
On appeal, a party is confined to the grounds for the objection made at
trial. Coke v. Coke, 802 S.W.2d 270, 275 (Tex. App.CDallas 1990, writ denied).  A party cannot change or enlarge the
objection on appeal.  Id.; see
also Perez v. Baker Packers, Div. of Baker Int=l Corp.,
694 S.W.2d 138, 141B42 (Tex. App.CHouston [14th Dist.] 1985, writ ref=d n.r.e.).  

Pojar=s objection to the evidence of his marijuana use on
the night of the accident was premised on his attorney=s belief that Cifre would attempt to prove Scott
Pojar=s impairment on the night of the accident solely by
the presence of marijuana metabolites in his urine the day after the accident.  This evidence was never offered by Cifre at
trial.  Instead, Cifre attempted to prove
impairment by eyewitness testimony that Scott Pojar used marijuana on the night
of the accident.  No objections were made
to this proof of impairment.  Nevertheless,
Pojar complains that the trial court erred by admitting the evidence.  Because no objection was ever made to this
specific evidence, we conclude that any error in its admission was not
preserved for appellate review.  McCormick
v. Tex. Commerce Bank Nat'l Asso., 751 S.W.2d 887, 890B91 (Tex. App.CHouston [14th Dist.] 1988, writ denied).

Pojar=s second issue is overruled.      

IV.  Award for
Loss of Past Services

In his third issue, Pojar contends that the evidence
is legally and factually insufficient to support the jury=s finding that $200,000 would fairly and reasonably
compensate Neida and Wendell Cifre for their loss of Beatrice Cifre=s services that Awere
sustained in the past.@  Pojar raised
this issue in a motion to modify the judgment, which was denied by the trial
court.  








The standards of review for legal and factual
sufficiency challenges are settled and will not be restated here.[12]  Having reviewed the entire record in the
light most favorable to Cifre, we conclude that there is no evidence to prove
that Neida and Wendell Cifre have lost any services from Beatrice Cifre.  

There was no direct testimony of lost services
offered at trial.  The evidence strongly
indicates that Beatrice Cifre has performed only minimal services, if any, for
her parents following the accident that left her a paraplegic.  It is equally apparent that she and her
family have suffered and continue to suffer tremendous physical, emotional, and
financial hardships because of the injuries she sustained in the accident.

Nevertheless, we believe that such evidence,
standing alone, is legally insufficient to establish $200,000 in lost
services.  The record contains no
evidence that Beatrice Cifre ever performed any services for her parents, let
alone evidence placing a monetary value on such services.

In Gonzalez v. Hansen, a case relied upon by
Pojar, the San Antonio Court held that a parent could not recover for the loss
of past services of her son, even though the undisputed evidence showed that
the boy had been totally incapacitated for two months following an accident
that left him permanently disfigured and handicapped.  Gonzalez v. Hansen, 505 S.W.2d 613,
615 (Tex. Civ. App.CSan Antonio 1974, no writ).  In reaching this holding, the court
emphasized the absence of evidence that the child=s
injuries prevented him from performing services he would have otherwise
performed.  Id. 








We find it noteworthy that no Texas court has ever
cited, much less relied on, the Gonzalez opinion.  This is perhaps owed to the opinion=s failure to acknowledge that virtually all
able-bodied children perform some services, such as chores, for their
parents.  We believe this reality is
within the ken of all reasonable jurors. 
A child=s complete incapacity, as in the Gonzalez
case, necessarily precludes the performance of any such services.  

Contrary to Pojar=s
argument, we believe that the monetary value of a child=s lost services is not akin to and cannot be
measured with the mathematical precision of lost wages or the like.  It makes little sense to demand that the
value of such services be established by equally certain and objective proof.  Nevertheless, the jury must assign some value
to the lost services, and in Gonzalez, that value was $5,000.  Id. at 613.  Rejecting the jury=s finding, the San Antonio Court noted that there
was no evidence that, prior to the accident, the boy had been earning any money
or performing any services or chores around the house.  Id.  at 615.      


With measured approval, we follow the Gonzalez opinion.  In doing so, we expressly decline to extend
its precedential authority to demand proof that can never be given with any
level of objective certainty.  The value
of a child=s lost services to her parents is inherently
subjective, even if it includes some objective elements, such as money earned
from third parties.  








We sustain Pojar=s
challenge to the legal sufficiency of the evidence because there is no evidence
that Beatrice Cifre ever performed any services for her parents or evidence
that she would have performed such services if she had not been injured.  See City of Keller v. Wilson, 168
S.W.3d 802, 827B28 (Tex. 2005). 
Evidence of lost services could have easily been offered on direct
examination and would not have presented the same concerns as evidence placing
a monetary value on such services.

Accordingly, we hold that the trial court erred by
failing to grant Pojar=s motion to modify the judgment by deleting the
award for loss of past services.  

V.  Finding of
Malice

In his fourth issue, Pojar asks this Court to render
a new judgment that disregards the jury=s finding of malice because the finding is
immaterial and because it is supported by legally insufficient evidence.  At a minimum, Pojar asks that he at least be
given a new trial because the evidence is factually insufficient to prove
malice.   

A trial court may disregard a jury=s finding only if it is unsupported by the evidence
or it is immaterial.  Spencer v. Eagle
Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994).  Pojar advances both types of arguments.  We will consider materiality first and then
discuss the sufficiency of the evidence.  


A. 
Materiality 








A jury finding is immaterial and may be disregarded
if the question should not have been submitted to the jury or if the question,
though properly submitted, was rendered immaterial by other findings.  Id. 
According to Pojar, the jury=s finding of malice was rendered immaterial by the
jury=s refusal to award any exemplary damages.  Pojar supports this contention with a line of
cases holding that Awhen the jury finds no damages, findings on issues
of liability are immaterial.@[13]  Having
reviewed this case law, we are compelled to note that several courts have
actually stated the rule as follows:  Athe general rule [is] that where the jury finds no
damages, findings on issues of liability are immaterial and harmless.@[14] (emphasis added). 
Pojar has not discussed the Aharmless@ part of the Ageneral rule@ in advancing his argument to this Court. 

We do not believe the general rule is necessarily
determinative in cases involving a finding of malice and an award of zero
exemplary damages.  In fact, in this
case, it is entirely plausible that the jury=s
finding of malice was not rendered immaterial by its finding that no exemplary
damages were necessary Aas a penalty@ for Scott Pojar=s
behavior.[15]  The record is replete with undisputed
evidence that Scott Pojar suffered tremendous physical trauma as a result of
the accident.  Perhaps the jury did not
assess any exemplary damages because Scott Pojar had already suffered so much
that further punishment would have been excessive.  It is not our place to speculate as to the
reasons for the jury=s verdict, but given the arguments advanced by
Pojar, we are compelled to note that we do not view the award of zero exemplary
damages as being inconsistent with the jury=s
finding of malice, nor do we think Scott Pojar should be relieved of the jury=s finding of malice simply because it chose not to punish
him for it. 








In upholding the trial court=s decision not to disregard the jury=s finding of malice based on immateriality, we note
that Pojar has produced no precedential authority for finding reversible error
in circumstances such as these.  Nor has
Pojar produced a single published opinion holding that a finding of malice is
rendered immaterial by an award of zero exemplary damages.       

B. 
Sufficiency of the Evidence

Pojar contends that the evidence is legally and
factually insufficient to support the finding of malice.  Malice is defined as

(A) a specific intent by the defendant to cause
substantial injury to the claimant; or

 

(B) an act or omission:

 

(i) which when viewed objectively from the
standpoint of the actor at the time of its occurrence involves an extreme
degree of risk, considering the probability and magnitude of the potential harm
to others; and

 

(ii) of which the actor has actual, subjective
awareness of the risk involved, but nevertheless proceeds with conscious
indifference to the rights, safety, or welfare of others.

 








Acts 1987, 70th Leg., 1st C.S., ch. 2, ' 2.12, eff. Sept. 2, 1987; amended by Acts
1995, 74th Leg., ch. 19, ' 1, eff. Sept. 1, 1995.[16]  In 1995, the legislature substituted malice
for gross negligence as the prerequisite for punitive damages, but it also
redefined malice, through the addition of subsection (B), to mirror the
definition of gross negligence articulated by the Texas Supreme Court in Transp.
Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994).  Mobil Oil Corp. v. Ellender, 968
S.W.2d 917, 921 n.2 (Tex. 1998). 
Consequently, prior precedent regarding gross negligence is relevant to
a finding of malice as redefined by the above provision.  See Ellender, 968 S.W.2d at 921 n.2.

Because malice must be proved by clear and
convincing evidence, an elevated standard of proof, we apply a more exacting
approach on appeal by reviewing the evidence to determine whether a reasonable
trier of fact could have formed a firm belief or conviction that its finding
was true.  See In re J.F.C., 96
S.W.3d 256, 264B68 (Tex. 2002); see also Southwestern Bell Tel.
Co. v. Garza, 164 S.W.3d 607, 621B22 (Tex. 2004).

As noted above, there was conflicting evidence
presented at trial as to whether Scott Pojar had used marijuana on the night of
the accident.  There was also conflicting
evidence as to which driver had a red light at the intersection and which
driver had a green light.  There was no
evidence that the traffic lights had malfunctioned.  In fact, everyone agreed that the accident
was caused by one of the drivers running a red light.  The jury found that Scott Pojar was the
driver at fault. 

On appeal, Pojar contends that the evidence is
legally and factually insufficient to prove malice because this Court Amust hypothesize@ that APojar unintentionally ran a red light on a deserted
road.@  Pojar also
argues, AThe testimony only supports the conclusion that
Pojar was a safe driver.@  Finally,
Pojar suggests that this Court should create a rule of law allowing Asome degree of inebriation [by marijuana to be] . .
. permissible while driving.@  Based on
these arguments, Pojar contends that the evidence is insufficient to prove
anything more than simple negligence.      









We disagree with Pojar on each of these points.  First, the undisputed evidence established
that the roads were not deserted at the time of the accident.  If they had been deserted, this case would
never have arisen.  The fact is that at
least three vehicles were in relatively close proximity at the intersection of
the two roads at the time of the accident. 

Second, there is no testimony in the record to
suggest that Pojar Aunintentionally ran a red light.@  Pojar and
his witnesses maintained unequivocally that he had a green light when he
entered the intersection.  There was no
testimony or evidence offered to show that Pojar ran the red light Aunintentionally.@  The evidence offered by Cifre and McCormick
tended to show that Pojar ran a red light, but there was no testimony as to
whether he did so intentionally or unintentionally.  

Third, the testimony does not, as Pojar argues,
support only the conclusion that he was a safe driver.  At best, the evidence was mixed on this
issue.  Running red lights, whether
intentionally or unintentionally, is hardly safe driving, nor is operating a
motor vehicle after using marijuana. 
Although Pojar denied using marijuana on the night of the accident, he
did admit that, on previous occasions, he had driven his car immediately after
smoking marijuana.  He also testified, AI believe it=s wrong to smoke marijuana and then get in a car and
drive it if you=re high . . . .@  Given the
foregoing testimony by Pojar, we will not address counsel=s suggestion that some marijuana useCa Alittle buzz@Cis reasonable while operating a motor vehicle.








Having reviewed the entire record, we conclude that
there is legally and factually sufficient evidence to support the jury=s finding that the combination of Pojar=s acts (namely, using marijuana, driving a vehicle
after using marijuana, and running a red light) involved an extreme degree of
risk, considering the probability and magnitude of the potential harm to
others, and that Pojar had actual subjective awareness of the risk involved but
nevertheless proceeded in conscious indifference to the rights, safety, or
welfare of others.  Whether viewed in the
light most favorable to the verdict or in a neutral light, there is sufficient
evidence for a reasonable trier of fact to have formed a firm belief or
conviction that the finding of malice was true.                                              

Pojar=s fourth issue is overruled.  

VI. 
Conclusion 

We have overruled all issues other than Pojar=s third issue, which asked this Court to Arender a new judgment that disregards the jury=s response to that question [about loss of past
services].@  We grant the
relief requested.  The portion of the
judgment awarding $200,000 for loss of past services is reversed and a judgment
is rendered awarding zero damages for loss of past services.  The judgment is otherwise affirmed.                  

 

_______________________

DORI CONTRERAS GARZA,

Justice

 

Dissenting Opinion by 

Justice Federico Hinojosa.

 

Opinion delivered and filed this

the 23rd day of February, 2006.











[1] 
See cases cited in footnote 5.   





[2] The parties to this appeal seem to
agree that there was no antagonism between Wendell, Neida, and Beatrice
Cifre.  There is also no indication that
any antagonism existed between Scott and Brenda Pojar.





[3] 
Pojar=s attorney relied on Diamond
Shamrock Corp. v. Wendt, 718 S.W.2d 766, 769 (Tex. App.CCorpus Christi 1986, writ ref=d n.r.e.) several times in making
arguments to the trial court.  Appellate
counsel for Pojar has also relied on the case. 
We are therefore confident that counsel understands the distinction
between equalization of peremptory challenges and realignment of sides, as that
distinction was emphasized in the Wendt opinion.  See id. 





[4]  Compare Am. Cyanamid Co. v. Frankson, 732 S.W.2d 648, 660B61 (Tex. App.CCorpus Christi 1987, writ ref=d n.r.e.) (AThe existence of antagonism is not a
discretionary matter; it is a question of law . . . .@), with Patterson Dental Co. v.
Dunn, 592 S.W.2d 914, 919 (Tex. 1979) (noting that the law Adoes grant discretionary power to
the trial court in allocating strikes@).





[5] Consider the following cases that
were each decided under the test for harm announced in Dunn and led to
reversals:  Garcia v. Cen. Power &
Light Co., 704 S.W.2d 734, 737 (Tex. 1986) (A[W]e hold that this was a hotly
contested trial which resulted in a materially unfair trial as a matter of law.@); AY@ Propane Serv. v. Garcia, 61 S.W.3d 559, 570 (Tex. App.CSan Antonio 2001, no pet.) (A>Y= Propane=s liability for the explosion was
hotly contested, and the liability evidence was sharply conflicting. We
therefore hold the error is reversible.@); Van Allen v. Blackledge, 35 S.W.3d 61, 66B67 (Tex. App.CHouston [14th Dist.] 2000, pet.
denied) ( AGiven the contested and conflicting
nature of the evidence, we find that . . . the trial [was] materially unfair.@); Carr v. Smith, 22 S.W.3d
128, 136 (Tex. App.CFort Worth 2000, pet. denied) (AThis case was hotly contested and
the evidence sharply conflicting.@); Vargas v. French, 716 S.W.2d 625, 627 (Tex. App.CCorpus Christi 1986, writ ref=d n.r.e.) (AAppellant met her burden of showing
that the trial was hotly contested and the evidence sharply conflicting. We
hold that the error resulted in a materially unfair trial.@); Parker v. Associated Indem.
Co., 715 S.W.2d 398, 401 (Tex. App.C San Antonio 1986, writ ref=d n.r.e.) (A[T]he trial was hotly contested and
the evidence sharply conflicting. It is not required that the plaintiffs show
more for this court to conclude the error resulted in a materially unfair
trial.@). 





[6] The reporter=s record shows that the following
exchange occurred prior to opening statements and outside the presence of the
jury:

 

Counsel
for Pojar:        I have put on the record in a number of
ways my objections to the evidence of marijuana in this case.  And the Court has graciously acknowledged a
running objection on voir dire during this issue.  It=s distasteful for me to interrupt opening arguments but I do
need to bring to the attention of the Court that I do object to any opening
statements regarding marijuana in this case and would respectfully request that
the Court knowledge [sic] that the Court knows that I object to that and that
this allows me to make a record of those objections without interrupting Mr.
Williamson or Mr. Williams to make that objection. 

 

The Court:                    Just
to be clear, you are objecting to any mention of marijuana usage by Mr. Pojar,
you are not objecting as to McCaughey, or whatever his name is as the
passenger?

 

Counsel
for Pojar:        That=s correct.

 

The Court:                    I
will overrule your objection and it=s a running objection throughout the trial.  But feel free to make it as many times as you
need.  I am not trying to cut you off.





[7] In counsel=s words:

 

[It is] relevant to negligent
entrustment. [It is] relevant to punitive damages, namely operation of a motor
vehicle under [the influence of] intoxicants and doing so knowingly, and when
you have a history of doing so and relevant to show he had a habitual use of
narcotics, and at that point who knew or should have known by his parents.

 

He is using marijuana several times
a week; has problems with school.  He has
problems - - he is not attending school. 
He is skipping school.  He is
known to have used marijuana by his parents. 
He is doing it several times a week. 
He has drug paraphernalia in the way of a pipe. [He] has drug
paraphernalia in the way of rolling papers. 
And he has a bumper sticker on his car which, in fact, is advocating
legalization of marijuana. 

 

The point I am making goes to
punitives [sic]. . .  

 

It goes to the accident or mistake.  It goes to the fact that he knew what he was
doing; knew what he was doing on the evening in question; knew what he was
doing 24-hours earlier when he smoked marijuana, and it goes to his state of mind
to show that he was consciously - - two things, goes to  the negligent entrustment issue and goes to
the fact that he was consciously indifferent to use of a motor vehicle while
using intoxicants and direct relevant to that. . . 





[8] On appeal, Pojar contends that the evidence was inadmissible on First
Amendment grounds that were never specifically 
raised before the trial court:

  

[The admission of such evidence]
will chill litigants= First Amendment rights to express
political views.  Bumper stickers that
advocate the legalization of marijuana come well within the scope of protected
First Amendment speech.  The sticker
proved little or nothing, yet managed to both instill unfair prejudice in the
jury and chill Pojar=s First Amendment rights.  The trial court blatantly abused its
discretion by allowing this evidence.

 

Appellant=s Brief, p.38 (citations omitted).  To the extent Pojar challenges the evidence
based on his First Amendment right to advocate for the legalization of
marijuana, he has not preserved error by a timely, specific objection.  See Tex.
R. App. P. 33.1(a).  Consequently,
the only question before this Court is whether Pojar=s running objection was sufficiently
specific as a rule 401 or 403 objection to the bumper sticker.  See Tex.
R. Evid. 401, 403.  We do not
answer this question because the record shows that Pojar subsequently waived
any objection to the evidence by stating he had Ano objection@ to it.    





[9] Even if Pojar=s complaint were properly before
this Court, we would still decline to grant relief on this sub-issue because
Pojar=s appellate brief fails to address
and negate all legal bases for the trial court=s ruling.  See The State Bar v. Evans, 774 S.W.2d
656, 659 n.5 (Tex. 1989).  As documented
in footnote 7, the A4:20@ bumper sticker was offered not only
as evidence for the claim against Scott Pojar but also as evidence for the
negligent entrustment claim against his mother, Brenda Pojar.  At the time the evidence was admitted, the
trial court had not yet dismissed the negligent entrustment claim by way of
instructed verdict.  Given that counsel
for Cifre expressly argued that the evidence was admissible on the negligent
entrustment claim, it was incumbent on Pojar to negate this basis for the trial
court=s ruling.  See Stewart v. Sanmina Tex., L.P., 156
S.W.3d 198, 214 (Tex. App.CDallas 2005, no pet.) (AIf any legitimate basis exists to
support a trial court=s evidentiary ruling, then we must
uphold the court=s decision.@); see also Ortega v. LPP Mortg.,
Ltd., 160 S.W.3d 596, 599 (Tex. App.CCorpus Christi 2005, pet. denied) (same).  Pojar has only addressed the ruling as it
relates to his First Amendment rights, a basis not urged below, and as it
relates to the claim against him for negligence.  Because Pojar has not attempted to negate all
bases for the trial court=s ruling (specifically, whether the
evidence was admissible on the claim against Brenda Pojar), we would be unable
to find an abuse of discretion even if this sub-issue were properly before
us.  See San Jacinto River Authority
v. Duke, 783 S.W.2d 209, 209B10 (Tex. 1990).  





[10] On appeal, Pojar appears to concede
that the issue of his impairment on the night of the accident was
relevant.  In part, he argues, ABut there was no expert evidence to
connect the urinalysis to any legally relevant effect, such as impairment.@ 
Appellant=s Brief p.31.  Thus, according to Pojar=s appellate brief, impairment is a Alegally relevant effect@ that would be relevant
evidence.  His chief argument at trial
and on appeal is that the presence of marijuana metabolites does not establish
impairment.   





[11] The relevant portions of the motion are items 19, 20, and 21:

 

19.        That tests performed at Hermann Hospital
on the morning after the accident show the presence of the metabolites of
Marijuana in the urine of Scott Pojar for the reason that this finding does not
constitute evidence of impairment of Scott Pojar at the time of this accident,
and is, therefore, irrelevant to any issue in this case.  To the extent that it has some arguable
relevance, this evidence is highly prejudicial and its prejudice far outweighs
any relevant to this case.

 

20.        That Scott Pojar smoked Marijuana on any
occasion for the reason that said evidence would not constitute evidence of
impairment of Scott Pojar at the time of the accident and the prejudicial
effect of this evidence would greatly outweigh any possible relevance. 

 

21.        That Scott Pojar, Beatrice Cifre, and
Jamie McCaughey were going to a friend=s house to find Marijuana on the evening of the accident in
question for the reason that said evidence is highly prejudicial and not
relevant to the cause of this accident.  

 





[12] See City of Keller v. Wilson, 168 S.W.3d 802, 827B28 (Tex. 2005) (legal sufficiency); Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761B62 (Tex. 2003) (factual
sufficiency). 





[13] The cases relied upon by Pojar
include the following:  Anderson,
Greenwood & Co. v. Martin, 44 S.W.3d 200, 217 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied); Hancock v. San Antonio, 800 S.W.2d 881, 885 (Tex. App.CSan Antonio 1990, writ denied); Canales
v. Nat'l Union Fire Ins. Co., 763 S.W.2d 20, 23 (Tex. App.CCorpus Christi 1988, writ denied); Howard
v. Faberge, Inc., 679 S.W.2d 644, 650 (Tex. App.CHouston [1st Dist.] 1984, writ ref=d n.r.e.); Garza v. San Antonio
Light, 531 S.W.2d 926, 929 (Tex. Civ. App.CCorpus Christi 1975, writ denied); Lewis
v. Isthmian Lines, Inc., 425 S.W.2d 893, 894 (Tex. Civ. App.CHouston [14th Dist.] 1964, no
writ).





[14]   Hancock, 800 S.W.2d at 885; Canales, 763 S.W.2d at
23; Szmalec v. Madro, 650 S.W.2d 514, 517 (Tex. App.CHouston [14th Dist.] 1983, writ
dism=d w.o.j.); Mitchell v. Chaparral
Chrysler‑Plymouth Sales, Inc., 572 S.W.2d 359, 360B61 (Tex. Civ. App.CFort Worth 1978, writ ref=d n.r.e.); Lewis, 425 S.W.2d
at 894. 





[15] 
The jury charge explained, A>Exemplary damages= mean any damages awarded as a penalty or by way of
punishment.@





[16] The current version of this
provision is found in section 41.001 of the civil practice and remedies code. Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(7) (Vernon Supp. 2004B05).  Section 41.001 of the Texas Civil Practice
and Remedies Code was amended by Act of June 2, 2003, 78th Leg., ch. 204, ' 13.02, 2003 Tex. Gen. Laws 847, 887, eff. Sept. 1,
2003.  Section 23.02(d) of Acts 2003,
78th Leg., ch. 204 provides that A[a]n action filed before the effective date of this Act . .
. is governed by the law in effect immediately before the change in law made by
this Act, and that law is continued in effect for that purpose.@ 
The instant action was filed prior to September 1, 2003 and is therefore
governed by the version of section 41.001 that was in effect prior to September
1, 2003.  All citations to section 41.001
in this opinion refer to the version in effect prior to September 1, 2003.